# DECLARATION

I, Heidi Bridges, pursuant to 28 U.S.C. § 1746, under penalty of perjury and pursuant to the laws of the United States, state that the following is true and correct to the best of my knowledge and belief:

1. I, Heidi Bridges, am a Special Agent (SA) of the Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI) and have been so employed for over five (5) years. I am assigned to the HSI Raleigh, North Carolina field office (HSI-Raleigh) and my duties include, among other things, investigating violations of Titles 8, 18, 19, 21, and 31 of the United States Code. As part of these duties, I have led or participated in investigations involving criminal and/or administrative violations related to money laundering, narcotics trafficking, bulk cash smuggling, identity theft, immigration benefit fraud, human smuggling, human trafficking, the illegal entry and/or re-entry of aliens, and immigration status violators. Prior to reporting for assignment at HSI-Raleigh, I attended training at the Federal Law Enforcement Training Center (FLETC) in Glynco, Georgia, where I received instruction in Federal criminal statutes, search, seizure and arrest authority, use of force, and many other facets of federal and general law enforcement. This declaration is based on my own knowledge and experience as well as information provided by other federal, state, and/or local law enforcement agencies.

2. This declaration is made in support of the forfeiture of $66,015.00 in U.S. currency seized from Mazen Abdelmuwl MANAEI pursuant to 18 U.S.C. § 981(a)(1)(C) as proceeds of a violation of 18 U.S.C. § 2342 (trafficking in contraband cigarettes/tobacco).

3. This forfeiture action arises from a traffic stop of Mazen Abdelmuwl MANAEI ("MANAEI") during an interdiction operation while law enforcement officers were investigating illegal trafficking of contraband cigarettes and/or controlled substances in Granville County, and elsewhere in North Carolina.

## Knowledge, Training, and Experience

4. Your affiant and members of the Granville County Sheriff's Office have attended specialized training in interdiction operations, as well as accumulated knowledge, training, and experience as it relates to tobacco smuggling operations. Both agencies are also members of a vast network of interdiction officers that specialize in tobacco smuggling including common themes, smuggling trades, patterns, trends, smuggling methodologies, and known smuggling personalities which are often broadcasted throughout this network to ensure interdiction officers are made aware of the same. Below are some common items or smuggling methods often encountered:

    4a. Grocery bags - in tobacco smuggling investigations, a significant number of experiences in the smuggling of bulk cash relating to the illegal sales of tobacco often result in smugglers utilizing black plastic bags to conceal money. These bags often come from the very tobacco retail stores used as fronts to launder proceeds of illegal activity. These bags are often placed inside various natural cavities throughout the vehicle, as

1

**EXHIBIT A**

opposed to bank bags often used by legitimate business persons. In some instances, legitimate bank bags are discovered with separate portions of money contained within. In other cases, a small portion of bulk cash is placed in plain view to attract the attention of a law enforcement officer so that the search will cease in order for the discovered money to be discussed, with the hope law enforcement will be satisfied with the story and discontinue the search; all the while a separate sizeable amount of bulk currency remains concealed in the vehicle in a different compartment.

    4b. Use of rental cars – the frequent use of rental cars is often an indicator that foul play is afoot. Smugglers will often rent vehicles for several purposes to include:

    i. The use of a rental car adds a degree of covertness as smugglers names are no longer tied to license plates which are often subject to inspection by interdiction officers and license plate readers throughout the Interstate system. In some instances, the smuggler is not the person who rents the vehicle, as smugglers who have been previously caught require a third party to rent the vehicle for them to add a degree of separation for the purpose of avoiding suspicion. Smugglers also use rental vehicles for the same purpose while sourcing cigarette locally in North Carolina to stash them prior to making a longer trip to a state such as New York where the cigarettes will be sold, and the money will be smuggled south.

    ii. The use of dedicated smuggling vehicles with a registered owner are also used in smuggling efforts. These vehicles are often vehicles with high mileage which is a result of driving throughout North Carolina to purchase cigarettes from various establishments such as smaller tobacco outlets, Sams Club, and the like wherein large purchases of cigarettes are conducted. These vehicles are also used to drive from North Carolina to New York and other areas wherein the price of cigarettes are higher, giving the seller of tobacco from the NC region an advantage. Due to the size of the cargo transported, minivans, larger SUV's, and pickup trucks are outfitted with tinting, and truck accessories to include truck bed covers to conceal the existence of contraband cigarettes in the rear of the vehicle.

    iii. Smugglers often make treks up and down the Interstate system causing mileage to increase significantly on vehicles. The use of rental cars keeps smugglers from having to use personal vehicles, mitigating wear and tear. HSI Raleigh, during this investigation has observed tobacco smugglers rent vehicles year-round to the point rental companies have sold the vehicle after one rental contract due to the mileage accrued by the smuggler exceeded 100,000 miles.

    iv. Luggage and Travel – tobacco smugglers often make trips from North Carolina to New York in one overnight trip. Some smugglers will often use diapers or paper towels for the purpose of relieving themselves while driving to minimize the number of stops needed to make the trip. Often, upon inspection, smugglers will provide law enforcement officers itineraries that exceed day trips which would require a common person to take a change of clothes, toiletries, and other related items with them. The lack of these items indicates the multi-day itineraries are likely fabricated.

v. Direction of travel – the direction of travel on the Interstate system is often indicative of what phase of the tobacco smuggling operation is occurring. Smugglers interdicted north bound will often have large loads of cigarettes contained within their vehicle. Smugglers traveling south bound are often encountered with bulk currency, which are the illegal proceeds received in New York, sent back to North Carolina, for the purpose of purchasing additional cigarettes.

vi. Use of blankets, sheets, and tarps – tobacco smugglers often choose vehicles with large internal cargo areas such as SUV's and pickup trucks. In order to conceal bulk tobacco products, tobacco smugglers will often use black sheets, blankets, or tarps to emplace over the contraband cigarette load as to conceal the contraband cigarettes from plain view from outside persons such as police officers approaching the driver side window during a traffic stop.

**The July 29, 2020 Seizure of $66,015**

5. Homeland Security Investigations, Raleigh, NC (HSI Raleigh) initiated a long-term investigative and interdiction operation for the purpose of preventing the movement, distribution, and smuggling of illicit counterfeit cigarettes and their proceeds through highly traveled thoroughfares within the Eastern District of North Carolina.

6. On July 29, 2020, officers from the Granville County Sheriff's Office (GCSO) conducted a traffic stop, on Interstate 85 southbound in Granville County, North Carolina, of a vehicle driven by Mohamad Ghalayini. The passenger was identified as Mazen A. MANAEI. Deputy Robinson noticed the light gray minivan, displaying an Ohio license tag, travelling south because it was following a semi-truck within one car length. As a result of the traffic stop, $66,015 in bulk cash was seized from the interior of the vehicle.

7. During the traffic stop, GCSO Deputy Robinson noted that all the sun visors were pulled down in the rear of the vehicle, but there were no occupants sitting in the rear. Deputy Robinson observed there was no luggage that would indicate a long-distance trip. Deputy Robinson greeted both occupants and explained to the driver that he was stopped for following the semi-truck too closely.

8. Deputy Robinson asked the driver for his identification, to which he provided a Connecticut driver's license of Mohamad Ghalayini. After asking twice, Ghalayini finally responded to Deputy Robinson's question of where they were going. Ghalayini stated they were going to Statesville to the auction. Ghalayini stated the passenger, Mazen MANAEI was going to purchase a vehicle.

9. Deputy Robinson contacted Deputy Jacob Winstead, with the Franklin County Sherriff's office working under a mutual aid agreement, to assist. Deputy Winstead arrived and spoke with MANAEI, while Deputy Robinson completed the warning ticket. MANAEI stated that they were going to Statesville to the Manheim auction to buy cars and that he was in the business of exporting cars overseas. However, MANEI's story that they were coming from New York did not match Ghalayini's story that they came from Connecticut.

3

10.  Deputy Winstead asked Ghalayini for consent to search the vehicle, to which Ghalayini manifested consent to search the vehicle. Deputy Robinson asked MANAEI to step to the front of his patrol car. The Deputy's searched the vehicle. Deputy Robinson searched the right middle passenger area and opened the floorboard compartment, behind the front passenger seat. Deputy Robinson immediately observed two black plastic bags containing a large amount of bulk currency, later determined to be $66,015.

11.  Further search of the vehicle located several sheets in the rear cargo area. Based on Deputy Robinson's training and experience, the inconsistent stories provide to Deputy Winstead by Ghalayini and MANAEI, the manner in which the bulk U.S. currency was being transported, and the sheets located in the rear cargo area (which are often used to conceal large amounts of cigarettes) he believed criminal activity was apparent.

12.  Deputy Robinson contacted Sergeant Garrett Paschall of the GCSO and informed him of his findings. Once Sgt Paschall arrived on scene, he asked Ghalayini and MANAEI who the current belonged to. MANAEI stated the U.S. currency was his and solely his. Ghalayini's criminal history includes a prior charge for transporting unstamped cigarettes. MANAEI does not have a criminal history.

13.  Also of note, the vehicle rental agreement showed a third-party rental by Bashar Momani, who has a criminal history, including a felony charge of transporting unstamped cigarettes in Maryland. The rental agreement showed the vehicle was rented by Mr. Momani in New Haven, Connecticut, just days prior, on July 9, 2020, with a scheduled return date of July 23, 2020. The odometer on the agreement was: 33,111 miles. On July 29, 2020, the odometer read: 40,736 miles. The rental vehicle had been driven 7,625 over 21 days, or an average of approximately 360 miles per day.  The distance between Granville County, NC and New York, NY is approximately 450 miles.

14.  While waiting for the money to be counted, Deputy Winstead contacted the Manheim auction and confirmed that auctions are held on Mondays and Tuesdays; no vehicles are sold Wednesday through Friday and July 29, 2020 was a Wednesday.  Deputy Winstead then asked each individual if they would speak with him about the currency and their travel plans without a lawyer present; both gave consent and agreed to speak with him.  MANAEI stated that he owns a car dealership called Aoisheh Auto Sales and has run the business for approximately 10 years.  MANAEI stated that he was going to Manheim in Statesville to purchase between three and five cars.  When Deputy Winstead asked MANAEI if he knew the auction was closed on Wednesdays, MANAEI then stated he came to look at cars and he would then buy them on the computer.  When asked why he brought so much cash if he was going to purchase cars online, MANAEI stated that he always carried that much cash in case he finds a private seller to purchase vehicles with.  MANAEI also stated that he had been to North Carolina approximately 10 times in the past year for the purpose of buying cars and looking to buy a gas station.  When asked about the gas station, MANAEI stated it was in Winston Salem but could not give any further detail.

15.  Based on my own training and experience and that of others involved in this investigation, the average cost of a carton of cigarettes (brand immaterial) is $56.00 per

carton in the state of North Carolina. The seizure of $66,015 in bulk currency will purchase approximately 1,178 cartons of cigarettes in North Carolina, which is a contraband quantity as defined by 18 U.S.C. § 2341(2). Once the cigarettes have been smuggled into New York, they can be illegally sold without payment of taxes for as much as $114.00 per carton. Each trip in which 1,178 cartons of cigarettes is smuggled from North Carolina to New York can potentially generate $134,292.00 in proceeds, which are then available to purchase another load of cigarettes in North Carolina.

## CONCLUSION

16. Based on the foregoing, probable cause exists to believe that the $66,015 in U.S. currency constitutes or is derived from proceeds traceable to specified unlawful activity, as defined in 18 U.S.C. §§ 1956(c)(7) and 1961(1), including trafficking in contraband cigarettes.

17. The foregoing facts are therefore sufficient to support a reasonable belief that the $66,015 in U.S. currency is forfeitable to the United States pursuant to Title 18, U.S.C. § 981(a)(1)(c).

Executed this 29th day of December 2020.

Heidi Bridges
Special Agent
Homeland Security Investigations